IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MAURICE MASON, | ) | CASE NO.  1:99CV524 |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | JUDGE DAVID A. KATZ |
| | ) | |
| BETTY MITCHELL, WARDEN, | ) | |
| | ) | MEMORANDUM  OPINION |
| Respondent. | ) | AND ORDER |

KATZ, J.,

This case is before the Court on remand from the Sixth Circuit.  In its Mandate Order, the

Sixth Circuit held that it could not determine from the record whether Petitioner's trial counsel

were ineffective for failing to investigate and present evidence during the mitigation phase of trial.

Consequently, the Sixth Circuit remanded the case to this Court to hold an evidentiary hearing on

this claim.  *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003).  The parties then conducted

discovery and the Court held an evidentiary hearing on December 29 and 30, 2003, and January 6,

2004.  The parties thereafter submitted post-hearing briefs.  For the reasons stated herein, the

Court finds that Petitioner's counsel were not ineffective in their investigation and presentation of

evidence during the mitigation proceedings of Petitioner's trial.

**I. Factual Background**

In this Court's prior Memorandum of Opinion and Order, it set out the following factual

history, as adduced by the evidence presented at trial, upon considering the petition for a writ of

habeas corpus:

> In February, 1993, Petitioner Maurice Mason, an African-American man, was a resident of Marion, Ohio.  Decedent Robin Dennis, a white woman, was a resident of Richwood, Ohio, and was acquainted with Mason.  Dennis was last seen alive on February 8, 1993.  On February 15, 1993, Dennis's body was found in an abandoned building in a rural area north of Marion, Ohio.  The coroner determined that she had died several days earlier as a result of blunt force trauma causing multiple skull fractures.  The probable weapon, a blood-stained board with protruding nails, was found twenty feet from Dennis's body.
>
> Evidence that Dennis had been raped was also found at the scene.  When Dennis's body was discovered, she was wearing only a bra; her jeans and panties were positioned around her ankles and lower leg.  She had been strangled, and there were bruises on her head, face, and body.  Inside and around Dennis's car, which was found near the murder site, forensic investigators discovered Nike tennis shoe impressions and type B blood, Dennis's blood type; the location of the tennis shoe marks and the blood were consistent with a struggle having taken place inside and around the car.  Semen was found in Dennis's vagina and on her panties; DNA testing determined that the semen was Mason's.
>
> Two witnesses saw a person fitting Mason's description walking in the area of the murder site between 4:10 and 4:15 p.m. on the day Dennis disappeared.  Police found Mason's car keys on the front seat of Dennis's car.  Type B blood was found on the side of a Nike[1] tennis shoe Mason was wearing on February 12, 1993.

(Doc. No. 84, at 1-3.)

Petitioner was charged with the rape and murder of Robin Dennis.  The case was tried

before a jury between May 31, and June 29, 1994.  The jury convicted Petitioner on both charges.

Thereafter, the trial court held a mitigation hearing.  During this hearing, defense counsel

Lawrence Winkfield and Ted Coulter presented the testimony of Gary L. Collins and Lisa

Johnston, two deputy sheriffs from the Marion County Jail Division.  Both testified that Petitioner

had not caused any major disturbances in the year that he had been incarcerated at the prison and

---

[1]     Dennis had also been wearing Nike tennis shoes at the time of the murder. Forensic investigators were unable to determine whether the shoes Mason was wearing matched the shoe marks found in and around Dennis's car.

-2-

that he was a model prisoner, (Doc. No. 40, at 4237-44).  Counsel also called Ruby Mason, Petitioner's mother, as well as his brother, sister, and cousin to testify.  The family members asked the jury for mercy and to spare the Petitioner's life.  *Id*. at 4245; 4247; 4249; 4251.

Defense counsel then called Terry Mason, the Petitioner's wife.  Similar to the other family members, she pled for the jury's mercy.  Additionally, Terry Mason displayed for the jury some drawings that the Petitioner had made for her since his incarceration.  On cross-examination, the prosecution questioned Ms. Mason regarding her recollection of the events that occurred on the day of the murder.  *Id.* at 4256-65.

Finally, Petitioner testified in his own behalf in an unsworn statement.  He denied killing Robin Dennis and asked the jury to sentence him to one of the two life sentences so that he could have "the chance to take [the conviction and sentence] through the Appeals Courts."  *Id.* at 4280.  Thereafter, the defense rested.  The prosecution did not offer any evidence in rebuttal.

## II. Habeas Proceeding

This Court denied the Petition on May 9, 2000, (Doc. No. 84).  The Petitioner then filed a motion for certification of appeal pursuant to 28 U.S.C. § 2253 on June 9, 2000, to which the Respondent filed an opposing brief on June 21, 2000.  The Court granted the motion, certifying all claims for appeal, (Doc. No. 90).  The Court denied Respondent's motion to file a supplemental memorandum opposing Petitioner's request for a certificate of appealability on June 26, 2000, (Doc. No. 91).

Concurrent with the filing of the motion for certificate of appealability, the Petitioner filed a notice of appeal on June 9, 2000.  The Sixth Circuit issued an opinion regarding this appeal on February 6, 2003, affirming in part and remanding in part this Court's decision to deny the writ of

habeas corpus.  *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003).  The Sixth Circuit affirmed this Court's denial of the writ on all claims except the Petitioner's ineffective assistance of counsel during mitigation claim.  It concluded that because the record before it was insufficient to determine whether Petitioner's counsel had provided him with constitutionally sufficient representation during the mitigation phase of trial, it could neither affirm nor reverse this Court's decision to deny the claim.

The *Mason* court found that while *Strickland v. Washington*, 466 U.S. 668 (1984) holds that strategic choices counsel makes after a thorough investigation of fact and law are "virtually unchallengeable," the strategic choice itself is only reasonable to the extent that counsel's investigation is reasonable.  *Id.* at 620.  It observed that although defense counsel had requested and received from the trial court permission to hire an investigator, the investigator's work pertained predominantly to the guilt phase of trial.  It also noted that defense counsel was in possession of "over 3,000 pages" of records concerning the Petitioner's social, educational, and criminal history.  *Id.* at 622.  Finally, the Sixth Circuit observed that defense counsel had prepared a videotape deposition of Dr. Joseph T. Spare, a psychologist who the trial court appointed to assist the defense at counsel's request.

After reviewing the investigation defense counsel performed, the Sixth Circuit noted several deficiencies in counsel's investigation.  First, it observed that defense counsel did not appear to have interviewed any family members, including the Petitioner, regarding possible mitigating evidence.  *Id.*  Instead, the Sixth Circuit determined that counsel had not adequately investigated the Petitioner's background for mitigating evidence.  It opined, "[h]ad counsel conducted an adequate investigation, the jury would have heard substantial evidence about how

-4-

drug use and violence pervaded Mason's background and life history." *Id.* It concluded that the documents the prosecution had supplied defense counsel "could not have contained anything close to the amount of mitigating evidence that could have been and later was obtained in an independent and thorough investigation." *Id.* at 623. It then held that the record before it was deficient to ascertain whether counsel had conducted an investigation into the Petitioner's background that was sufficient to cull any substantial mitigating evidence.

The Sixth Circuit next examined defense counsel's decision not to present any mitigating evidence. It noted that on direct appeal, the Ohio Supreme Court had held that counsel's decision not to present mitigating evidence was not deficient because of the Petitioner's criminal history and prior bad acts, including an alleged prior rape. Although this Court had found this holding was reasonable under *Strickland* based on the Sixth Circuit's decision in *Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000), in which the Sixth Circuit held that counsel's failure to present mitigating evidence was reasonable based on the petitioner's extensive criminal history, the *Mason* court distinguished *Scott*, stating that, because the state court in that case had held an evidentiary hearing, the habeas court was bound to the state court's factual findings. *Id.* at 625. Although the *Mason* court found that counsel may have been reasonable by deciding not to present evidence of the Petitioner's good character so as not to open the door to any damaging rebuttal evidence, it reasoned that "[t]estimony that simply put Mason's childhood into context without misrepresenting it would not have been subject to the prosecutor's rebuttal evidence, which mostly concerned Mason's character." *Id.* at 627.

Finally, the Sixth Circuit reviewed the Petitioner's inadequate psychiatric assistance claim, in which the Petitioner asserted that Dr. Spare failed to develop adequate mitigating evidence and

should have been disqualified because of a conflict of interest that stemmed from his treatment of the Petitioner's wife.  Because the Petitioner's mitigation defense was based on residual doubt and a call for mercy, the Sixth Circuit held that the Petitioner was not entitled to psychiatric assistance during the mitigation phase of trial under *Ake v. Oklahoma*, 470 U.S. 68 (1985).  The Sixth Circuit held that the Petitioner might still be entitled to relief, however.  Because a competent psychologist would have conducted an extensive investigation into the Petitioner's background and such an inquiry, in turn, would have yielded a multitude of mitigating evidence to sway the jury's sentencing decision, the *Mason* court found that the Petitioner may "still have an ineffective assistance claim for the deficient performance of defense counsel in apparently relying on Dr. Spare for an independent investigation into mitigating evidence."  *Mason*, 320 F.3d at 627.  The Sixth Circuit concluded its analysis of the Petitioner's ineffective assistance during mitigation claims by finding that, because he had not yet had a hearing on this issue, it must remand the matter to the district court to factually develop the claims that the Petitioner raised.

Prior to holding such an evidentiary hearing, the Court entertained numerous motions and granted several pre-hearing requests for discovery.  First, the Petitioner requested funds for an investigator and expert, which the Court granted on July 18, 2003.  The Respondent also moved the Court to conduct depositions and record depositions in preparation for the evidentiary hearing.  The parties disputed the availability and scope of the depositions.  Specifically, the Petitioner objected to questioning his attorneys and any agents thereto, i.e., any mental health professionals that his attorneys hired, on the grounds that it violated the attorney-client privilege and the work product doctrine.  He urged the Court to limit the scope of his own deposition on the same grounds.

-6-

On October 15, 2003, the Court issued an Order regarding the availability and scope of the depositions the Respondent requested, (Doc. No. 41). The Court held that the Petitioner had waived the right to assert the attorney-client privilege or work product doctrine regarding the mitigation phase of trial. It limited this waiver, however, to permit the Respondent to question the Petitioner and counsel only about conversations that occurred in preparation for the mitigation hearings. Thus, the Court prohibited the Respondent from broadly questioning the Petitioner regarding his commission of the murder, allowing questions regarding culpability only to the extent they were discussed in preparation for mitigation proceedings. *Id.* at 5.

After the parties conducted discovery, the Court held an evidentiary hearing on this matter on December 29 and 30, 2003, and January 6, 2004. The hearing focused on only a few critical points, described below.

The Petitioner first called trial counsel Lawrence Winkfield to testify. Winkfield admitted that he was not death penalty certified when he was first appointed to the case. Upon taking the required continuing legal education courses, however, he testified that he became death penalty certified by the time the trial commenced. Winkfield further stated that he and co-counsel Ted Coulter divided their duties during trial. He recalled that his duties consisted primarily of those related to the culpability phase of trial and Coulter primarily was responsible for the mitigation preparation. Coulter then testified regarding his mitigation investigation and how he prepared for the mitigation proceedings. He stated that he initially called the Ohio Public Defender's Office (hereinafter "OPD") to request assistance in trying the case. Specifically, Coulter contacted Jane Core, a mitigation specialist for the OPD, to discern whether her office could provide mitigation investigation assistance. The OPD stated that they would not provide counsel with any aid until

-7-

counsel became death penalty certified.

Once he became death penalty certified, Coulter testified that he again contacted the OPD to ascertain whether they would provide him with any assistance.  At that time, the staff at the OPD indicated that their case load was too heavy to provide counsel with any aid in the mitigation investigation but gave counsel a list of private individuals who possibly could aid counsel in obtaining mitigation evidence.  Coulter stated that he contacted James Crates, a mitigation specialist, to aid him in gathering mitigation information.  Counsel next applied to the trial court for funds to obtain a mitigation investigator.  The trial court held a hearing on the issue of whether to provide counsel with funds to hire a mitigation specialist and forensic psychologist.  Counsel sought and obtained the testimony of Dale Baich from the OPD to explain the importance of these experts in aiding the defense team to prepare for mitigation.  Coulter testified that the trial judge had not encountered a request for a mitigation specialist before and appeared unpersuaded at the hearing of the importance of funding one.  Additionally, the prosecutor, James Slagle, opposed the funding of these experts, asserting that because the prosecution had provided counsel with extensive records regarding the Petitioner's history, expenditures on these experts were unnecessary.  Thereafter, the trial court denied counsel's request for a mitigation specialist and reserved ruling on whether to appoint a psychologist.

Coulter stated that upon the trial court's refusal to grant counsel funds to hire a mitigation specialist or a forensic psychologist, he again contacted the OPD and spoke to Core in an attempt to procure some mitigation assistance.  Although he could not recall the specifics, Coulter did recall that either he or Core mentioned the name of Dr. Jeffrey Smalldon, a forensic psychologist, but could not recall if either he or Core made any contact with him.  Counsel then turned to Dr.

-8-

Spare, a psychologist who had treated the Petitioner's wife, Terry Mason.  He set forth his reasons

for requesting the services of Dr. Spare:

> We had filed two previous motions for [sic] request for forensic psychologist and
> mitigation specialist with experience in death penalty cases, and [it] appeared to us
> that the Court was not going to grant such funds for those types of experts, and so
> with the idea that at least maybe we can get an MMPI or some testing we didn't
> have at that stage, Dr. Spare, he would be a local doctor [that] would be a lot less
> expensive based on the impressions I got from the Court and, therefore, I filed a
> motion and the conference with the prosecutor [sic] he wasn't going to prepare that,
> so I prepared the entry and got Mr. Slagle's signature and took it to the Court.
> And then again, as you can see by that entry, the type is different there, and
> I don't know if the court's secretary or myself or whatever on the judge's
> instruction limited the cost of that up to a total cost not to exceed $600 exclusive of
> court testimony.

(Doc. No. 221, at 67.)  In addition to limiting the amount counsel could expend on Dr. Spare, the

trial court relayed to counsel that the purpose of obtaining psychiatric assistance was to ascertain

whether the Petitioner was a "repeated [sic] serial killer."  *Id.* at 127.  Coulter stated that the trial

court was "concern[ed] about cost and [the psychologist] being local and not having to transport

Maurice very far."  *Id.* at 200.

Petitioner's counsel also questioned Coulter regarding his entry on the billing statement

containing five hours for review of mitigation materials.  Coulter testified that this was the review

of over 5,000 pages that the prosecutor had provided him, (Doc. No. 221, at 75).  He stated that

the records contained much of the Petitioner's criminal history, including his juvenile court

records, records from Children's Services, drug treatment program involvement, and some school

records.  He also attempted to procure additional records from the juvenile court, Marion County

Children's Services, as well as Marion Area Counseling.   From viewing these documents, Coulter

learned that the Petitioner was born into a drug-dependent family, that the family had in the past

and currently was dealing drugs, and that both parents previously had been incarcerated for drug

trafficking. Counter also vaguely recalled his co-counsel attempting to contact law clinics or law schools to obtain assistance in the mitigation investigation but did not recall any responses to such inquiries.

Counter spoke with James Mason, Jr., the Petitioner's older brother. James Mason, who was a guard at the Marion Correctional Institution, stated that although his parents treated everyone fairly, Petitioner often was singled out because he would run away and he was the "wild one." *Id.* at 145. He further told Counter that although there was spanking in the family, there was no abuse. James admitted that there was a drug problem in the home. He stated that the Petitioner "ran with the wrong bunch" and that his father would tell stories of doing illegal activities without getting caught and that "Maurice tried to emulate him." *Id.* at 146. Counter also sought out and spoke with Lowell Titus, the Petitioner's probation officer. Titus told Counter that the family was into drugs and that the Petitioner was not a good probationer.

Counter testified regarding the notes he had procured regarding the Petitioner's family history. He stated that he grouped this information into categories as follows:

> A:     The first category seems to be when he was in Lima in a drug and alcohol program therein referring to Lima prison. [The Petitioner] talks about the interface program, the lady who ran the program, and becoming a sponsor and a drug counselor and also the lady's name, and then there's the London program. Again, if I interpret my notes correctly, he was incarcerated in a Snap Program, he did some testing in there called an interface program.
>
>         And then on the bottom third would be in terms of two divisions. One would be in terms of some personal recollections of Maurice, said when his dad went to prison and his mom whipped him and his brothers were tied. His father tied him up too and whipped him. Defendant ran and [his father] did not catch him. Dad would whip him. His dad would beat his mom and stabbed [his brother].
>
>         Tory, I believe, who is his brother, talked about [how] Maurice always was blamed, and he would say he didn't do it and always ran. His father would abuse him. He would be drunk or high, and dad sold drugs before he was born.

(Doc. No. 221, at 161-62.) Counter also testified regarding one incident in which the Petitioner

-10-

had told him that his mother's bicycle had been lost.  His father accused him of selling the bicycle and began beating him.  The Petitioner then ran away to avoid further beatings.

Coulter recalled he talked to the Petitioner regarding mitigation at various points during the trial.  He also stated that he spoke with the Petitioner's family members briefly, calculating that the interviews took minutes, rather than hours.

In preparation for mitigation, Coulter stated that he read the transcripts from the two other death penalty cases from Marion County, the David Penton case and the Joseph Murphy case.  Coulter also contacted Mr. Robert Wilson, Murphy's attorney, regarding his representation of Murphy.  In that case, also tried before Marion County Common Pleas Judge William Wiedemann, Wilson had presented during mitigation an extensive life history and background of Murphy in hopes of building juror sympathy for him and to avoid a death sentence.   Despite presenting this evidence, however, Murphy's jury sentenced him to death.

Coulter next testified regarding the issue of the State's ability to call rebuttal witnesses.  Through ongoing pre-trial discovery, Coulter learned of the prosecution's intent to call rebuttal witnesses at the mitigation phase of trial.  He stated that Slagle informed him that if he introduced evidence of the Petitioner's family history or his non-violent character, the prosecution intended to raise several issues in rebuttal.  Coulter testified that Slagle would raise evidence of a parole violation where Petitioner allegedly brandished a firearm before a woman named Barbara Jones, another incident where he allegedly pushed a woman, and past convictions for burglary and drug trafficking.  By far the most damaging rebuttal information in the hands of the prosecution was the allegation that the Petitioner had previously raped an eighteen-year-old girl named Danielle Miller in October, 1992, a few months before the rape and murder of Robin Dennis.  Coulter noted the

-11-

similarities between the Dennis murder and the Miller attack:

> [S]he was similar [sic] aged to the victim of this case alleged and I think she was around 18 years of age.  The allegation of rape occurred approximately three or four months before this alleged incident, and there was a threat of force, and . . . our concern was that the jury would see through her, possibly the pain, and it would be damaging to our plea for his life.

*Id.* at 201.

Coulter stated that he spoke briefly with the Petitioner regarding this alleged rebuttal evidence.  Regarding a past burglary charge, the Petitioner referred counsel to Dave "Chicken" Brown as someone who could reveal how the burglary had actually occurred.

Coulter testified that he believed that, pursuant to *State v. DePew*, 528 N.E.2d 542 (Ohio 1988), much of the information regarding the Petitioner's prior bad acts and character would not be admissible during the mitigation proceedings.  According to his interpretation of *DePew*, the prosecution could introduce rebuttal evidence if the defense misrepresented the Petitioner's criminal record, but that much of the mitigation information defense counsel intended to introduce would not open the door to the State's rebuttal evidence.

The trial court, Coulter testified, held an *in camera* conference on whether *DePew* permitted the prosecution to use its rebuttal evidence.  Coulter stated that the judge's interpretation of *DePew* was vastly different from his own.  Rather than limiting the prosecution's ability to introduce rebuttal evidence, the trial judge intimated that if counsel were to raise the Petitioner's family history as a mitigating factor as to why the criminal act may have occurred, then defense counsel would open the door for the state to rebut this explanation of the Petitioner's background with damaging information regarding the Petitioner's prior criminal record and bad acts.

-12-

Coulter testified that even if he had omitted Dr. Spare's testimony regarding future dangerousness and presented only the testimony regarding the Petitioner's family history, he believed Judge Weidemann had a "hair trigger" regarding the introduction of any rebuttal evidence, i.e., the trial court believed that *DePew* opened the door for the prosecution's rebuttal evidence even if counsel had merely presented evidence of the Petitioner's background and did not present any evidence of the Petitioner's non-violent character, (Doc. No. 221, at 227-28). Coulter admitted that, based on the trial court's interpretation of *DePew*, he was "totally torn" as to whether he should introduce the Petitioner's family background evidence during mitigation, (Doc. No. 122, at 92).

To amply assess the possible damaging effects of Danielle Miller's testimony, Coulter stated that he traveled to Fulton, Ohio to interview her.  Coulter had learned through discovery that Miller was reluctant to testify and he was hoping that she would not be willing to do so at the mitigation hearing.  Coulter testified that to the best of his recollection, he eventually made contact with her on June 26, 1994.   At that time, Miller told him that the Petitioner had raped her and that she would be willing to testify about the rape during trial.

Consequently, Coulter testified, he held a conference call with Core and Dick Vickers from the OPD, Mike Geis from the Ohio State University linguistics department, and co-counsel Winkfield regarding whether to pursue a strategy of family history coupled with an assertion of non-violence that would open the door to the prosecution's rebuttal evidence or to pursue a strategy in which counsel would assert residual doubt and plead for mercy.  Upon the conclusion of the conference, the consensus was that counsel should not choose a strategy involving the Petitioner's family history because of the State's ability to introduce damaging rebuttal evidence.

-13-

Instead, Coulter testified that he and co-counsel decided that they would pursue a residual doubt/mercy strategy.  He stated that he thought he had a good argument for residual doubt: "[W]e felt we had a legitimate argument because . . . again, referring back to the record, I think there was one juror, even post-trial issues showed [the juror's] hesitancy with the verdict," (Doc. No. 122, at 210).

After counsel finished questioning Coulter during the evidentiary hearing, the Court asked Coulter whether, if the trial court would have provided unlimited funds, he would have altered his decision to present the mitigation defense they chose.  The colloquy went as follows:

> THE COURT:  But as it turned out, Mr. Coulter had you been given substantially more funds by Judge Wiedemann, it would have still come down, would it not, in your opinion then held, as to the viability or strength of your mitigating evidence against the strength of the prosecutor's rebuttal evidence?
> THE WITNESS:  We would have still had to weigh it, yes, Your Honor. The discussion as we had more information psychologically or evidentiary-wise with a mitigation specialist you could weigh it and go with that strategy.

(Doc. No. 221, at 228-29.)

The Petitioner next called Donald C. Schumacher, at attorney who testified regarding the professional standards as of 1994, when the trial occurred.  He asserted that an attorney in a capital case must make himself or herself familiar with friends and family members who would be a natural group to interview to glean any mitigation information.  He stated that defense counsel should start planning immediately to secure some expert assistance to aid the defense team.  He also asserted that relying on lack of future dangerousness as a mitigating factor had the potential of turning the jury against a capital defendant if counsel failed to establish this fact to the jury. Schumacher asserted that, pursuant to his interpretation of Ohio law as of 1994 and now, the defense does not open the door to rebuttal evidence unless it presents evidence that is either

-14-

inaccurate or misstates some point of evidence.   Finally, he testified that if a trial court were to deny defense counsel adequate funds to investigate a defendant's social or mental history, then counsel would be obligated to obtain this background information in preparing for the mitigation phase of trial.

Dr. Robert Smith then testified on the Petitioner's behalf.  He depicted the severe dysfunctional home in which the Petitioner grew up.  He described a home in which both parents were daily drug users as well as drug traffickers, where the children were isolated from both authorities and other children whose parents did not purchase drugs from the Petitioner's parents. He described the Petitioner's father as being repeatedly violent when intoxicated, particularly towards Ruby Mason and the Petitioner.  Dr. Smith also described one occasion when Ruby Mason shot her husband while the children were in the home.  He revealed that, in addition to drug trafficking,  James Mason, Sr. was involved in prostitution activities.

In addition to reporting on the Petitioner's home life, Dr. Smith testified regarding the Petitioner's mental health.  He stated that, largely because of the effects of the home environment, the Petitioner had a borderline personality disorder.  When afflicted with this disorder, he explained, an individual has no self-image or self-concept.  They have very strong fears and have difficulty forming relationships with others, in part because of their severe mood swings and suicidal tendencies.  He also diagnosed the Petitioner with having a substance dependence.

The Court questioned Dr. Smith regarding his opinion of Dr. Spare's evaluation.  In response to the Court's questions, Dr. Smith testified that, given the financial constraints under which the trial court placed Dr. Spare, he could not have conducted a meaningful psychological evaluation of the Petitioner.  Second, Dr. Smith stated that any conflict of interest under which Dr.

-15-

Spare labored because of his prior treatment of Terry Mason was not relevant to any issue other than a code of ethics to which Dr. Spare would have been bound.  Finally, Dr. Smith conceded that, given the financial constraints under which Dr. Spare had to operate, Coulter's request that he focus on the Petitioner's future dangerousness made little difference in the outcome of the examination.

The Petitioner next called Dr. Jeffrey Smalldon, a psychologist who examined the Petitioner during state post-conviction proceedings.  Dr. Smalldon testified regarding how he typically performs a forensic evaluation for a capital case.  He also stated that to cull all of the necessary background information, a forensic psychologist must perform an in-depth investigation into a defendant's background.  Dr. Smalldon opined that, given the limited funds provided by the trial court, Dr. Spare could not have performed an adequate forensic evaluation.  He further questioned whether Dr. Spare was sufficiently qualified to perform such an evaluation in a capital case or perform a Minnesota Multi-Phasic Personality Inventory test.  Dr. Smalldon questioned the validity of Dr. Spare's diagnosis because it was based on limited examination of the Petitioner and review of the records.

In addition to his examination of the Petitioner during the state court proceedings, Dr. Smalldon stated that he re-evaluated the Petitioner for purposes of the evidentiary hearing.  In his testimony, he largely repeated the family history first relayed to the Court by Dr. Smith.  He stated that, had he been asked to testify during the mitigation proceedings, he would have attempted to humanize the Petitioner, placing his actions in the context of his family and social background.  On cross-examination, however, Dr. Smalldon conceded that he did not come to a final diagnosis of the Petitioner.

-16-

James F. Crates, a mitigation specialist, next testified on the Petitioner's behalf.  He explained that his role in a capital case is to conduct an inquiry into a defendant's social and psychosocial history.  He testified that trial counsel contacted him during the course of the trial but that he did not actually work on the case until 1996, during state post-conviction proceedings.  At that time, he had a conversation with Ruby Mason regarding the Mason home.  Ruby Mason described the drug trafficking and physical abuse in the home, as well as the Petitioner's experimentation with drugs by age eight.  In the sixth and seventh grades, Crates relayed, Ruby Mason revealed that the Petitioner would accompany his father on trips to purchase and sell drugs.

Several of the Petitioner's family members also testified during the evidentiary hearing.  First, the Petitioner's father, James Michael Mason, Sr., stated that he and his wife fought on occasion but that he "always lost," (Doc. No. 222, at 424).  He described his drug business as home based but stated that he had ten people working for him selling drugs.  He stated that these workers provided financial support to his wife and family while he was incarcerated.  He further stated that his relationship with his wife was good during his time in prison, and that she and the children would visit him every visiting day.  James Mason also admitted to running a prostitution ring for approximately three years.

Regarding his relationship with the Petitioner, James Mason stated that while he was incarcerated, the Petitioner began running away from home and stealing.  After departing prison, he stated that to punish the Petitioner for stealing, he would whip him.  He also revealed that the Petitioner at one point had the "worst juvenile record in Marion county."  *Id.* at 442.  Despite his court involvement for stealing, James Mason described his son as a non-violent person who had a good reputation in the Marion, Ohio community.

-17-

The Petitioner's first cousin, Minnie Range, testified during the hearing.  She testified regarding the strained relationship between Ruby and James Mason.  She also stated that Ruby shot James because of his involvement with prostitution.  James Mason, Jr., Mioshi Mason, and Michelle Floyd, all siblings of the Petitioner, testified regarding their childhood in the Mason home.  Each reiterated prior testimony regarding the drug use in the home and the isolation they suffered from children whose parents were not drug associates of their parents.  The siblings also verified that they were whipped as a means of punishment in the household.

The Respondent called two witnesses during the evidentiary hearing.  First, the Respondent called Danielle Miller Richardson.  She stated that in 1992, she and the Petitioner were about to engage in consensual intercourse when they were interrupted by her friend before any sexual contact occurred.   The following week, the Petitioner came to her home and told her that he wanted to speak with her.  She entered his car and he told her that they were "going to finish what we had previously started."  *Id.*  Although she attempted to exit the vehicle, Richardson testified that the Petitioner smacked her in the face and told her to shut the door.  She then described the rape and disclosed that he twice went to reach underneath his seat, where Richardson was aware that he kept a gun.  At some point during the rape, Richardson testified, the Petitioner stated that he was going to have to kill her.  He did not harm her, however, allowing her to walk back to her home.

The Respondent next called Nancy Fortner Bernard, a prior girlfriend of the Petitioner's.  She stated that in 1993 counsel Winkfield contacted her prior to trial.  She told Winkfield that the Petitioner had been violent with her when they were seeing each other in the 1980s.  Additionally, she stated that during the time in which she was romantically involved with the Petitioner, they

had gone to the location which was later to be the site of the Dennis murder.  After her testimony, the evidentiary hearing concluded.  The Court thereafter permitted the parties to submit post-hearing briefs, (Doc. Nos. 226, 228, 229, 230).

## III. Applicable Law

### A. Decisional Law

The *Strickland v. Washington*, 466 U.S. 668 (1984) test, pronounced over twenty years ago, is the familiar standard for evaluating ineffective assistance of counsel claims.  Specifically, *Strickland* dictates that a petitioner must satisfy a two-prong test to establish ineffective assistance of counsel.  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  Second, the petitioner must show that he or she was prejudiced by counsel's errors.  The *Strickland*  Court held that, "[t]his requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.*

To assert a successful ineffective assistance of counsel claim, a petitioner must point to specific errors in counsel's performance.  *United States v. Cronic*, 466 U.S. 648, 666 (1984). Thereafter, the *Strickland* Court held, a reviewing court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy.  *Id.* at 689.  As the Supreme Court recently affirmed, "'Judicial scrutiny of a counsel's performance must be highly deferential' and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

-19-

challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Bell v. Cone*, 535 U.S.685, 698 (2002)(quoting *Strickland*, 466 U.S. at 689).

Since the Supreme Court decided *Strickland*, that Court, as well as the Sixth Circuit Court of Appeals, has issued several important opinions expounding on the *Strickland* standard.  In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court held that counsel's failure to investigate and present to the jury mitigating evidence constituted a Sixth Amendment violation.  There, the Court held that trial counsel's failure to discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.[2]   The Court found that counsel's decision not to expand their investigation in the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to *Strickland*.

The *Wiggins* Court cautioned, however, that "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.   While *Strickland* established that strategic decisions can be virtually unchallengeable, the *Wiggins* Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation.  *Id.*  Finding that the information the petitioner's trial counsel already had reviewed triggered a duty to investigate

---

[2]        The Court noted the extensive hardships the petitioner faced during childhood:
>          [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked.  . . .  Petitioner's first and second foster mothers abused him physically and . . . the father in his second foster home repeatedly molested and raped him.

*Id.* at 516-17 (citations omited).

-20-

the petitioner's background further, the Court held that trial counsel's actions were objectively unreasonable under *Strickland*.

The Supreme Court again emphasized counsel's duty to investigate for mitigating evidence in its recent decision *Rompilla v. Beard*, _ U.S. _, 125 S.Ct. 2456 (2005). There, the Court held that defense counsel had a duty to investigate for mitigating evidence despite the defendant's and his family's insistence that none existed. The Court found counsel's performance ineffective when they failed to review the court file containing the defendant's prior convictions, even though counsel knew that the prosecution would be using this conviction, including reading portions of a prior trial transcript in which the defendant committed a similar offense to the one at issue during trial, to bolster its support for an aggravating factor during the sentencing proceeding. *Id.* at 2464. While the Court credited counsel with some efforts to obtain mitigating evidence, it held that counsel's failure to review the prior conviction file, despite their knowledge that the prosecutor intended to utilize it and the ease with which counsel could have obtained it, rendered their assistance below the constitutional minimum required under the Sixth Amendment. *Id.* at 2467.

The *Rompilla* Court also was concerned with the multitude of mitigating evidence to which counsel would have availed themselves had they reviewed the prior conviction file. Records contained in this file revealed that the defendant was reared by alcoholic parents, that Rompilla's father regularly beat him and his mother, that the family home was filthy, and the children were not given clothing, attending school "in rags." *Id.* at 2468-69. Based on these circumstances, the *Rompilla* Court held that counsel's failure to review the prior conviction file prejudiced the outcome of the sentencing proceeding.[3]

---

[3]

In her concurring opinion, Justice O'Connor took pains to observe that, contrary to the

The Sixth Circuit Court of Appeals also has issued several recent opinions regarding counsel's Sixth Amendment obligations in the mitigation phase of a capital case.  In *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003), the Sixth Circuit held that courts must review trial counsel's actions in light of the American Bar Association's guidelines.  Those guidelines suggest the need for counsel to explore a petitioner's medical, educational, and employment history, as well as obtaining a family and social history through, *inter alia*, contact with family members.  *Id.* at 487 n.2.  The guidelines also state the necessity of reviewing a multitude of records to provide counsel with clues regarding the client's "childhood abuse, retardation, brain damage, and/or mental illness . . .  ."  *Id.*

Moreover, in *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), the Sixth Circuit held that counsel acted in violation of *Strickland* when they failed to procure evidence that the petitioner sustained a brain injury that impaired his brain functioning.  *Id.* at 794.  Although aware of this injury, counsel did not investigate its occurrence or the possible impact it may have had on the petitioner's behavior and commission of the crime.  Moreover, counsel failed to present any mitigating evidence, other than the petitioner's unsworn statement, during the mitigation phase of trial.  The Sixth Circuit held that counsel's failure to investigate could not be part of a reasonable

---

dissent's contention, the Court was not holding that counsel must always review all documents in a prior conviction file.  *Id.* at 2469.  Instead, she opined, three circumstances of that particular case required counsel to make this inquiry.  First, she noted that defense counsel were aware that the prosecution was going to use details of the prior conviction to prove an aggravating circumstance.  Moreover, defense counsel knew that the prosecution's use of the prior conviction would undercut counsel's planned mitigation strategy of arguing residual doubt.  Finally, Justice O'Connor reasoned that counsel's failure to review the prior conviction file was a result of counsel's inattention, rather than part of some reasoned strategic judgment.  *Id.* at 2471.

trial strategy.  *Id.* at 795.  Thus, it concluded, the state court had unreasonably applied *Strickland* in its contrary finding.

In several other Sixth Circuit cases, however, the court held that counsel did not provide ineffective assistance during the mitigation phase of trial when the petitioner could not establish how counsel's alleged unreasonable conduct prejudiced the outcome of the sentencing proceeding. In *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005), for example, the court held that counsel were not ineffective for failing to hire a mitigation psychologist until the day before the mitigation phase of trial when the defendant previously had been examined by several psychologists.  The court  reasoned that the petitioner could not substantiate an ineffective assistance claim because he could not demonstrate that testimony from a psychologist with more time to prepare for mitigation would have differed significantly from the testimony the psychologist actually provided during the mitigation proceedings.  *Id.* at 316.  Thus, the court found that the petitioner could not establish the prejudice necessary to demonstrate counsel's ineffectiveness.

Similarly, in two other Sixth Circuit opinions, the court found that petitioner could not establish that counsel's alleged acts or omissions prejudiced the outcome of the mitigation proceeding.  First, in *Thompson v. Bell*, 315 F.3d 566 (6th Cir. 2003), the Sixth Circuit held that counsel could not establish ineffective assistance of counsel for failure to discover evidence that the petitioner suffered from organic brain damage when the petitioner was unable to establish in any post-trial proceeding that he suffered from such a malady.  Although the petitioner had presented some inferences after trial that he had brain damage and was currently suffering from schizo-affective disorder, the Sixth Circuit found such inferences could not lead it to the conclusion that counsel did not act diligently during trial.  It reasoned, "absent some evidence of

-23-

organic brain damage or mental illness at the time of the crime, trial counsel cannot be deemed ineffective for failing to discover something that does not appear to exist." *Id.* at 590.

Finally, the court held in *Smith v. Mitchell*, 348 F.3d 177 (6th Cir. 2003), that because virtually all of the mitigating evidence petitioner asserted during the habeas proceedings was presented to the three-judge panel during the mitigation hearing, the petitioner could not establish prejudice under *Strickland*.  Thus, the court found that counsel's representation was not in violation of the Sixth Amendment.  *See also Clark v. Mitchell*, 425 F.3d 270, – (6th Cir. 2005)(holding that counsel were not ineffective for failing to present mitigating evidence that was substantially similar to that presented during mitigation hearing).

### B. American Bar Association Guidelines

Several of the cases examined above uphold the American Bar Association (hereinafter "ABA") guidelines as the paradigm for defense counsel performance in capital cases.[4]  These guidelines set forth instructions regarding how trial counsel should prepare for the mitigation phase of a capital trial.  The guidelines state, in regard to mitigation, that counsel should begin their initial preparation for that phase of trial "immediately upon counsel's entry into the case and should be pursued expeditiously."  ABA Guideline 11.4.1 (1989).   It further states that any investigation for the sentencing phase of trial should include, but not be limited to:

> medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma, and developmental delays); educational history (achievement, performance and behavior) special educational needs (including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment training history (including skills and performance, and

---

[4]

The ABA has published several editions of the Guidelines.  For purposes of performing a proper *Strickland* analysis, the Court utilizes the 1989 edition of the guidelines as that was the most recent edition published at the time of the Petitioner's trial.

> barriers to employability); family and social history (including physical, sexual or
> emotional abuse); prior adult and juvenile record; prior correctional experience
> (including conduct on supervision and in the institution, education or training, and
> clinical services); and religious and cultural influences.

ABA Guidelines at 11.4.1.(2)(B) (1989).

In addition to this extensive investigation, the guidelines propose several steps for counsel

to take in preparation for their mitigation presentation.  They suggest that counsel discuss the

sentencing phase with the client.  ABA Guideline 11.8.3 (1989).  While the guidelines emphasize

that the preparation for each case is necessarily distinct because it must involve an assessment of

the individual defendant, it lists topics that counsel should consider presenting during sentencing,

such as: (1) medical history; (2) educational history; (3) military service; (4) employment and

training history; (5) family and social history; (6) rehabilitative potential of the client; (7) record

of prior offenses; (8) expert testimony concerning any of the above . . . .  ABA Guideline 11.8.6

(1989).

The commentary to the guidelines emphasizes that counsel must be proactive in their mitigation

investigation and preparation.  It states:

> Obviously, the uniqueness of every client makes guidelines as to the sentencing
> phase a starting point, not a checklist.  However, counsel in every capital case
> should consider strategies offered by other attorneys, discussed in the literature or
> otherwise available for consideration.  Counsel may not choose, without
> investigation and preparation, to sit back and do nothing at sentencing.

ABA Guideline 11.8.6. cmt.(1989).

## IV. Discussion

### A. Counsel's Mitigation Investigation

Based on the testimony presented during the evidentiary hearing, particularly that of

Coulter, it is clear that defense counsel did not inadequately prepare for the mitigation

proceedings.  As stated above, counsel were aware of a multitude of mitigation evidence that they could have presented during mitigation.  First, counsel knew about the drug culture that prevailed in Mason's home, that his parents were drug dealers, and that both had served time in prison for drug trafficking.  Counsel were also aware that Mason was heavily addicted to drugs and was involved in drug sales.  Moreover, contrary to the *Mason* court's assertion, 320 F.3d at 622, counsel were aware after deposing Dr. Spare in 1994 that Mason began using drugs during his childhood years.[5]

Based on the testimony obtained during the evidentiary hearing, counsel were aware of the physical abuse that occurred in the Mason home.  Counsel knew that the Petitioner's father became violent with him and his brothers and that his mother beat him while his father was in prison.  Counsel were also aware of the incident in which the Petitioner's father accused him of stealing his mother's bicycle and the Petitioner's subsequent attempt to run away from home.  Finally, Coulter knew about the physical violence that occurred between the Petitioner's mother and father.

---

[5]

During the 1994 deposition, counsel questioned Dr. Spare regarding the Petitioner's admissions to him regarding his family's drug use:

> Q: Did he relate to you how he felt about that environment as he grew up in it?
> A: Well, it was interesting, he said he was embarrassed that it was known in the neighborhood that his family were drug people.  That didn't keep him from becoming drug involved at a fairly early age, however.
>
> * * *
>
> He started having difficulty with rules and regulations and being consistent probably in the middle elementary grades, and started to use drugs at about the same time and seemed to become a more pervasive problem as time went on.

(Doc. No. 151, Exh. 1, at 9-10.)

While Coulter obtained much of the information regarding the Petitioner's background from the voluminous documents supplied to him by the prosecution, he also sought and obtained additional records from the juvenile court, Marion County Children's Services, as well as Marion Area Counseling.  Although unsuccessful, counsel also sought the services of the OPD to aid them in their mitigation investigation.  Finally, while Coulter conceded that his interviews with family members were brief, he learned from them that the Petitioner grew up in a "drug house" and that his father physically abused the Petitioner and other family members.

Perhaps the only mitigating information of which Coulter was unaware was the fact that the Petitioner's father ran a prostitution ring.  As the *Wiggins* Court counsels, however, the duty to investigate further is triggered only when the information that trial counsel already reviews warrants further investigation.  *Wiggins*, 539 U.S. at 527.  Neither defense trial counsel here encountered any information in either their interviews with family members or their review of documents that suggested that the Petitioner's father was involved with prostitution.  Thus, counsel could not have reasonably known about it nor were they constitutionally required to discover its existence.

Although counsel did not procure an extensive mental health evaluation of the Petitioner, the trial court limited counsel's efforts to obtain such information.  The trial court's limitation on the funding of a mental health expert obviously curtailed counsel's endeavors to procure a full psychiatric examination of the Petitioner.  Moreover, Coulter testified that the trial court directed any psychological examination to pertain to the Petitioner's future dangerousness.  Thus, although Coulter initially attempted to obtain a thorough psychological assessment of the Petitioner's mental health, the trial court curtailed counsel's attempts through its funding and focus

restrictions.  Left with the choice of obtaining no psychological assistance or a limited one aimed at assessing the Petitioner's future dangerousness, counsel's decision to opt for the latter is not an unreasonable one under the circumstances.

Once Coulter became aware of the trial judge's opinion regarding the *DePew* holding, he thoroughly investigated the prosecution's rebuttal evidence.  Coulter discussed the rebuttal evidence with the Petitioner, learning from him that a man named "Chicken" Brown could supply counsel with mitigating information regarding the Petitioner's participation in a prior robbery.  Importantly, Coulter also traveled to Fulton, Ohio, where he located Danielle Miller to assess her credibility and the potential impact of her testimony.

Based on counsel's and, more specifically, Coulter's efforts to investigate and procure mitigating evidence as described above, the Court cannot find that this investigation was an unreasonable one.  Unlike defense counsel in *Wiggins*, where counsel's review of limited records should have prompted counsel to investigate further or *Frazier*, where counsel knew of a brain injury but did not investigate its possible effects on the Petitioner, defense counsel here appear to have exhausted all avenues of procuring mitigating evidence available to them.  In fact, the Court is hard pressed to conjure what further investigation counsel could have performed based on the information known to counsel at the time of the trial.  While counsel's development of the Petitioner's mental health status was limited, this limitation, as stated above, came at the behest of the trial court, rather than counsel's failures in attempting to procure it.  Accordingly, the Court finds that, pursuant to the requirements set forth in *Strickland* and its progeny, counsel's mitigation investigation did not fall below that required by the Sixth Amendment.

### B. Counsel's Mitigation Strategy

-28-

As *Strickland* teaches, strategic choices counsel make after a thorough investigation of fact and law are "virtually unchallengeable." *Strickland*, 466 U.S. at 620. This case proves to be no exception to that rule. Not only did counsel perform a thorough investigation of the Petitioner's background and social and family history, counsel's mitigation presentation strategy cannot be assailed. Counsel made this decision only after seeking advice from numerous qualified counsel such as the OPD, who had a wealth of experience in trying capital cases. Moreover, Coulter contacted attorney Wilson to gain some insight into what might occur if counsel were to choose a strategy that included introducing the Petitioner's history and social background. Obtaining advice from other counsel regarding their mitigation strategy comports with the ABA guidelines, in which counsel are encouraged to "consider strategies offered by other attorneys." ABA Guideline 11.8.6. cmt.(1989).

Based on the trial court's interpretation of *DePew* and the damaging rebuttal evidence that the jury would have heard had counsel chosen a history and social background strategy, the Court finds that counsel were not unreasonable in deciding that a residual doubt/mercy strategy was more prudent. Unlike the views of the Sixth Circuit in *Mason*, 320 F.3d at 627 ("Testimony that simply put Mason's childhood into context without misrepresenting it would not have been subject to the prosecutor's rebuttal evidence, which mostly concerned Mason's character"), the trial court specifically held that even if counsel presented only the mitigating evidence pertaining to the Petitioner's family and social history, *DePew* would allow the prosecution to present its rebuttal evidence. Thus, counsel were faced with the Hobson's choice of either presenting the Petitioner's family background and/or character but opening the door to damaging rebuttal evidence, or presenting a more limited residual doubt/mercy strategy that could fail to humanize

-29-

their client to the jury.

While depicting his family background undoubtedly would have evoked sympathy from the jury, the prosecution's rebuttal evidence, particularly the testimony of Danielle Miller, could have turned the jury against him. Moreover, counsel were aware that one juror was troubled by the guilty verdict. Thus, counsel could reasonably conclude that a residual doubt strategy might persuade the jury to vote for a sentence less than death. Although it is tempting now to assert that counsel should have introduced evidence pertaining to the Petitioner's childhood and family background based on subsequent Ohio cases interpreting *DePew*,[6] that is not the analysis that *Strickland* mandates. As the *Strickland* Court held, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. In reviewing counsel's conduct based on the trial court's rulings and information they knew at the time of the trial, this Court cannot find that counsel acted unreasonably.

Moreover, based on the trial court's reading of *DePew*, it is not clear that the Petitioner was prejudiced by counsel's failure to introduce the family background evidence. It would be pure speculation to presume that a jury who heard the Petitioner's family background evidence yet

---

[6] As the Sixth Circuit observed, in *State v. Henness*, 679 N.E.2d 686, 698 (Ohio 1997), the Ohio Supreme Court iterated that the *DePew* holding only allows the State to introduce rebuttal evidence if the defendant misstates his or her criminal history.  The *Henness* decision was issued three years after the Petitioner's trial.  Thus, defense counsel could not have used it to bolster their assertion that *DePew* would render the prosecution's rebuttal evidence inadmissible if he presented only evidence of his family background and social history.  Counsel cannot be held ineffective for failing to anticipate the *Henness* decision's  firm resolution of this issue. *Lott v. Coyle*, 261 F.3d 594, 609 (6th Cir. 2001).

also were made aware of his prior bad acts and criminal record would have spared him the death penalty.  The rebuttal evidence, particularly Miller's testimony that the Petitioner had raped her a few months prior to the Dennis rape and murder, could have undercut significantly any attempts by defense counsel to portray the Petitioner as a victim of his family background and social environment.  Thus, the Petitioner cannot establish, as he must under *Strickland*, that the failure to introduce the family background evidence rendered his sentencing proceeding fundamentally unfair.

### C. Psychiatric Assistance

As the *Mason* court acknowledged, the Petitioner had no constitutional right to psychiatric assistance during his mitigation hearing.  It observed, however, that the Petitioner "may still have an ineffective assistance [of counsel] claim for the deficient performance of the defense counsel in apparently relying on Dr. Spare for an independent investigation into mitigating evidence." *Mason*, 320 F.3d at 627.  Thus, because a "competent psychiatric expert would have conduct[ed] a wide-ranging, very thorough inquiry into Mr. Mason's psychosocial background," *id.*, and Dr. Spare's review of the Petitioner was a limited one, the court reasoned that the Petitioner might have a meritorious ineffective assistance claim.

As outlined above, however, Dr. Spare's examination of the Petitioner was curtailed by the financial constraints placed on him and trial counsel by the trial court.  Both of the Petitioner's psychologists, Dr. Smith and Dr. Smalldon, agreed that with such limited funds, Dr. Spare would have been unable to perform any meaningful forensic psychiatric evaluation.  Moreover, counsel attempted to procure both a mitigation expert and an independent mental health expert to examine the Petitioner.  When the trial court refused, they turned to Dr. Spare as a local professional whom

-31-

the trial court might agree to hire because his assistance would not require the Petitioner to be transported to another location.  Finally, the trial court appeared uninterested in procuring a complete psychological evaluation of the Petitioner, instead focusing any examination on the Petitioner's future dangerousness.  Thus, contrary to Schumacher's testimony, it was not counsel's strategy to focus the psychiatric testimony on this issue.  Defense counsel were hamstrung by the restrictions placed upon them by the trial court.  Based on these restrictions, this Court cannot find that counsel's decision to rely on Dr. Spare was an unreasonable one.

The Court also observes, as it did during the evidentiary hearing, that the trial court's financial restrictions, which in turn led to Dr. Spare's limited mental evaluation, may ultimately have had a minor impact on defense counsel's decision whether to present it during trial.  Because the trial court held that this evidence, like the family background and character evidence, would have opened the door to the prosecution's rebuttal evidence, counsel's decision as to whether to introduce it during trial was substantially similar to the one they would have faced even if Dr. Spare or some other mental health professional would have conducted a thorough psychiatric examination.  Thus, there is no clear indication that defense counsel's failure to procure a full psychiatric profile of the Petitioner influenced counsel's strategic choice or the outcome of the mitigation proceeding.  Accordingly, the Court finds that the Petitioner's ineffective assistance of counsel claim for relying on Dr. Spare's evaluation lacks merit.

### D. The Ohio Supreme Court's Decision

In its decision affirming the Petitioner's ineffective assistance of counsel claim, the Ohio Supreme Court reasoned that counsel's actions were reasonable because they were part of a strategic decision.  It held:

-32-

Mason argues that his counsel failed to investigate and present a life history of Mason and his psychological background so that he would not receive the death penalty. Mason also complains about the paucity of mitigation evidence presented in defense.

The record, however, suggests that defense counsel had voluminous records about his history and background. Counsel prepared twelve exhibits documenting aspects of Mason's childhood, such as reports that he was beaten by his father and released by his parents to juvenile authorities, as well as early psychological evaluations, but did not present them to the jury. Mason argues that these exhibits show that a cogent, persuasive mitigation case could have been built revealing Mason's childhood exposure to violence, his dysfunctional family, and his early emotional and psychological problems.

But the records also show prior involvements with the criminal and juvenile justice systems, and other unfavorable matters. Mason could not have presented evidence as to his good character and rehabilitation potential without risking the introduction of negative evidence by the state in rebuttal.

Similarly it was not an unreasonable strategic decision to refrain from presenting the video deposition of psychiatrist Dr. Spare in order to avoid rebuttal by evidence of Mason's behavioral problems, character deficiencies, and poor potential for rehabilitation. We will not second-guess the strategic decisions counsel made at trial even though appellate counsel now argue that they would have defended differently. *State v. Post* (1987), 513 N.E.2d 754, 762.

Nor has Mason shown prejudice, the second Strickland requirement, namely "a reasonable probability" that different tactical choices at the penalty phase would have made a difference in the result. *See State v. Bradley*, 538 N.E.2d 373, paragraph three of the syllabus.

*State v. Mason*, 694 N.E.2d 932, 956 (Ohio 1998).

This Court finds the Ohio Supreme Court's decision was not an unreasonable application of or clearly contrary to any United States Supreme Court precedent.  As *Strickland* requires, the Ohio Supreme Court analyzed counsel's actions based on what reasonable counsel would have done at the time of the trial.  It held that, after reviewing "voluminous records" regarding the Petitioner's history, counsel's decision to refrain from introducing evidence of the Petitioner's troubled childhood was a reasonable one based on the choices counsel faced at the time of trial.

-33-

Moreover, the Ohio Supreme Court held, the Petitioner failed to demonstrate that counsel's decision not to present more extensive mitigating evidence in light of the prosecution's ability to rebut that evidence prejudiced the outcome of the trial.  Thus, the Ohio Supreme Court utilized the *Strickland* two-pronged test and applied it to the strategic decisions counsel made after performing an adequate mitigation investigation.  This decision is not an unreasonable application of the *Strickland* decision.  Accordingly, the Court finds that, pursuant to the 28 U.S.C. § 2254(d)(1), the Petitioner is precluded from obtaining habeas relief for this claim.[7]

### V. Conclusion

For the foregoing reasons, the Court finds that after conducting the evidentiary hearing as required by the Sixth Circuit Court of Appeals, *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), the Petitioner's claim for habeas relief based on trial counsel's inadequate investigation and preparation for the mitigation phase of trial is not well-taken.  The Petition is hereby dismissed.

The Court hereby issues a certificate of appealability pursuant to 28 U.S.C. §2253(c) as to this claim for relief.

IT IS SO ORDERED.


　　　　　　　　　　　　　　　　　　　　 *S/ David A. Katz*

_____

[7]　　　　While the Sixth Circuit in *Mason* purports to accept the Ohio Supreme Court's finding that the rebuttal evidence was admissible under Ohio law, it nonetheless observes that *DePew* would not have applied to the introduction of the Petitioner's social background and family history mitigating evidence.  *Mason*, 320 F.3d at 627. Short of finding this holding is "clearly contrary to" or an "unreasonable application of" United States Supreme Court precedent, however, this Court cannot find the claim has merit.  A habeas court cannot use its independent judgment to grant a petitioner habeas relief.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

DAVID A. KATZ
U. S. DISTRICT JUDGE